Carroll L. Woolf held a certificate of the Metropolitan Life Insurance Co. dated April 1st, 1943, certifying that under the conditions of a group policy issued to his employer he was insured for $20,000 which on his death would be paid to his then wife Mary E. Woolf named therein as beneficiary, with *Page 589 
the right reserved to the insured to change beneficiary. The certificate provides that in case the beneficiary should die before the insured, the interest of the beneficiary shall vest in the insured. It further provides that if there be no designated beneficiary at the time when any insurance shall be payable, then the proceeds shall be payable to the insured's wife or husband, if living; if not living, to the children of the insured who survive him, equally. It has printed thereon the words, "The insurance herein set forth is non-assignable." For the purposes of this case I can see no difference between such a certificate and an ordinary life insurance policy and for convenience I will speak of it as the policy.
Mary E. Woolf, the beneficiary named in the policy, died April 8th, 1943, and the insured then had three living children namely, George, Carroll and Cornelius Roy who claim that a few days after the burial of their mother their father orally assigned and transferred his policy to them. The insured married again October 17th, 1943, his second wife's name being Helen W. Woolf, and he died July 27th, 1944. At no time did the insured attempt to have a change in beneficiary endorsed on his policy, nor did he give the insurer notice of assignment thereof. After his death claims were made on the insurer for payment of the amount due under the policy, on the one hand by insured's second wife and on the other by his three children, whereupon the insurer paid the amount into court and the contest here is between the respective claimants. The claim of insured's widow is based wholly on the fact that she is his widow and as such is entitled to the fund under the terms of the policy. The claim of the children is based on the aforesaid oral assignment.
The insured resided in a home owned by himself and his first wife as tenants by the entirety. It was also the home of his deceased wife and of his unmarried sons Carroll and Cornelius Roy (the latter known as Roy); his son George who was married, lived in a nearby home of his own. When the mother died Carroll and Roy were in the United States Army and both obtained leave of absence to attend their mother's funeral. At the date of the hearing of the cause Carroll was in service in Germany and could not attend. Roy holds the *Page 590 
rank of first lieutenant and has had three years service in the army air force and the proof to support the claim of the sons depends entirely on his testimony considered in the light of the surrounding circumstances. His testimony is summarized as follows:
A day or two after Roy's mother's funeral his father called him to his (father's) room and said, "There are certain things we don't care to talk about. However, there are times when it is necessary to do so. We never know when anything is going to happen to us," and he advised Roy to have payment under his government insurance changed from his mother to his father. At that time the father took from his bureau drawer a large leather wallet or pouch and from the wallet the father took the policy on Roy's life, also the policy here under consideration and he handed the latter to Roy and said, "I want you three boys to have this policy and its proceeds as a present for your future protection in case anything happens to me, and I want you three boys to have this house." Roy held his father's policy a few moments and handed it back to his father who returned it to the wallet saying, "I will put it in here with the rest of the family papers so that you will know where it is in case it is necessary for you to find it," and his father placed the policy in the wallet and put the wallet back in his bureau drawer. A week later Roy returned to his station taking his own government policy with him and caused change of beneficiary to his father to be made therein, after which he sent his policy to his father. Roy never had possession again of the policy on his father's life after the few moments he had it in his hand a day or two after his mother's funeral, and he never saw it thereafter until it was found in the wallet after his father's death. Roy was back home in July, 1943, for ten days and after that stay he did not return home again until August, 1944.
The insured continued to live in his home after his first wife's death until the end of September, 1943, and after he remarried he lived elsewhere with his second wife until his death. He kept his household furniture in his old home and returned there for occasional week-end visits, seeing his son George at those times. He did not tell George of his remarriage *Page 591 
nor had he ever spoken to George or Carroll about his policy although he had shown it to George a few weeks after his wife's death when it was in his wallet. After Roy's return home in August, 1944, Roy for the first time informed George of the assignment of the policy but Roy had discussed the assignment with his brother Carroll shortly after Roy's talk with his father about it. Almost immediately after the insured died, George moved to his father's home and was living there when Roy returned in August, 1944. When Roy then told George about the assignment a search was made for the wallet and it was discovered hidden behind a radiator in the bedroom the father had occupied.
The wallet had been owned by the father many years and he usually kept it in his bureau drawer or in his desk drawer in his home. When it was found behind the radiator it contained the policy here under consideration, the government policy on Roy's life, a similar policy on the life of the son Carroll and various other papers and documents of no interest or value to any one other than the father.
The insured's second wife testified that insured had told her he had left some papers in a box behind the radiator in his home saying, on the occasion of his last visit there, that he had intended to bring them to the home where he was living with her but had neglected it. She testified further that she knew he carried some insurance of a considerable amount but he had not spoken to her about the policy in question and that she was unaware of its existence.
At the time it is claimed the policy was assigned to the insured's children the interest of the deceased beneficiary therein named was vested in the insured and a valid gift or parol assignment of the policy could be made by him without notice to the insurer. Metropolitan Life Insurance Co. v. Haggerty,109 N.J. Eq. 663; Guardian Life Insurance Co. v. Mareczko, 114 N.J. Eq. 369.
The question here is whether the proof on behalf of the children is sufficient to establish that such a gift was made. The essential facts necessary to prove an inter vivos gift are first, a donative intent on the part of the donor; second, an actual delivery of the subject-matter of the gift to the extent to which delivery is most *Page 592 
capable, and third, a parting by the donor with all ownership and dominion over the subject-matter of the gift. Swayze y.Huntington, 82 N.J. Eq. 127; affirmed, 83 N.J. Eq. 335; GuardianLife Insurance Co. v. Mareczko, supra.
Our courts have said that the uncorroborated testimony of the donee claiming a gift must be carefully scrutinized, but where there is no claim of fraud or undue influence, less testimony is required to establish a gift from a father to his children than as between persons who are not related and it is said that very slight evidence will suffice. Bankers Trust Co. v. Bank ofRockville, c., 114 N.J. Eq. 391.
I was favorably impressed with Roy's appearance and manner at the hearing of the cause and with his frankness and apparent candor in testifying and I accept his testimony as sufficient to prove his father's donative intent with respect to the policy and its delivery to him, but because almost immediately he returned the policy to his father and it remained thereafter in his father's possession until the father's death, the third essential of a completed gift namely, whether the father had stripped himself of dominion over the policy, presents a serious question but I regard the fact, standing by itself, that the father had physical possession of the policy as of slight importance when considered in connection with the relationship existing between him and his children and the surrounding circumstances. The mother having died, a gift of the policy to the children was a natural event not only because they were the insured's sons but also because by the terms of the policy its proceeds would be payable to them on the father's death.
It was suggested that because Roy believed it necessary to have change of beneficiary made in the policy on his own life, he would naturally have retained the policy on his father's life in order to make the gift certain by causing change of beneficiary to be made therein, but he had no reason to think his father might attempt to revoke his gift. Since a valid gift of the policy could be made by parol, failure to evidence the gift in one way is not proof that it was not made in another way.Farrell v. Passaic Water Co., 82 N.J. Eq. 97; In reChryssikos, 135 N.J. Eq. 451. *Page 593 
When the policy was handed to Roy with words expressing a donative intent, the gift was complete and the title of the father passed to Roy. Acceptance by the father of redelivery with the statement by the father that he would put the policy in a place where Roy could find it when necessary, casts no doubt on Roy's title. Matthews v. Hoagland, 48 N.J. Eq. 455, 485;Corle v. Monkhouse, 50 N.J. Eq. 537, 545. In Parker v.Copland, 70 N.J. Eq. 685, it is said that a gift can be sustained as a gift on satisfactory proof that continuation or restoration of the donor's dominion over the gift was not an integral part of the donative transaction concurred in as such by the donor; in other words that such dominion is apparent only and in fact forms no part of the donative act in which the donor was engaged.
After the father had placed the policy in Roy's hand with the statement of a donative intention expressed in the words that he wanted his boys to have it and its proceeds as a present, it does not seem that he could have received the policy back with any intention, through physical possession of it, of later revoking his declared present intention to make a gift; rather that such repossession indicated his intention to hold it for his sons as their property.
The transaction must be considered in the light of the circumstances. When the father handed the policy to Roy the latter then held it as donee, otherwise the father's expressed donative intention accompanied by delivery was a meaningless act. The father received the policy back knowing he had made a gift and knowing also that Roy was returning to his military station and had no safe place in which he could maintain actual possession of the policy other than in his own home and that no one there, other than his father, was in position to keep it safely, and never having been discharged from his military service he never had the opportunity to again take and hold physical possession of the policy prior to his father's death.
There is no proof that the father after making gift of the policy attempted to exercise any act of dominion over it such as naming a new beneficiary. If he had not assigned the policy to his sons, he could have delivered it to his second *Page 594 
wife; he could have named her as beneficiary and he could, at least, have informed her that through his marriage to her she had become the beneficiary under a policy on his life and that he held this particular policy for her benefit. His failure to do any of those things and his silence toward her with respect to the policy are strong indications that he had given the policy to his sons; that his insurance was no concern of his wife and that he desired her to remain in ignorance of the policy's existence, as an asset in which she had no interest.
The fund in court will be awarded to the insured's three sons. *Page 595